[No. 2070.]

### ALEX. HORNSBERGER *v.* THE STATE.

1. ACCOMPLICE — CHARGE OF THE COURT.— Whether or not a witness for the State is an accomplice in the perpetration of the offense for which the defendant is on trial, in the sense that his testimony must be corroborated by other evidence tending to inculpate the defendant, cannot be made to depend upon the conclusion of the jury as to the truth or falsity of his statements on the trial. Hence, the trial court erred in charging, in effect, that the main witness for the State was not an accomplice unless the jury should find, beyond a reasonable doubt, that his evidence was true. See the opinion on the subject, and for the charge *in extenso.*

2. SAME — STATUTES DISTINGUISHED.— The distinction between articles 741 of the Code of Criminal Procedure and 219 of the Penal Code is that the word "accomplice," as used in the former, includes principal offenders and accessories as well as technical accomplices, whereas the word as used in the latter does not.

APPEAL from the District Court of Wise. Tried below before the Hon. F. E. Piner.

The conviction in this case was for the theft of one head of cattle, the property of J. F. Wilkins, in Wise county, Texas, on the 1st day of April, 1885. A term of two years in the penitentiary was the penalty assessed against the appellant.

M. W. Shoemaker was the first witness for the State. He identified the defendant as the man from whom, in October or November, 1884, he purchased the animal alleged to be stolen. The price paid the defendant by the witness was $20. Prior to this purchase the animal was turned into witness's pasture, about two and a half miles east of Decatur, in Wise county, by "Doc" Prigmore, who told witness that the animal belonged to the defendant. Witness saw that animal in the pasture before the purchase. The animal's brands were a circle-Z on the side, a Z on the hip, and a blotched

brand that could not be deciphered. Witness could not remember the animal's ear-marks. Some time after the steer was placed in witness's pasture, witness met "Doc" Prigmore and the defendant in a bank in the town of Decatur. Prigmore introduced the defendant to the witness, remarking that defendant owned the steer he had put in witness's pasture, and wanted to sell the animal. Witness purchased and paid for the animal, and received a bill of sale thereto, written and signed, then and there, by the defendant. The defendant told the witness that he lived about eight miles west of Decatur, where he owned cattle. After witness bought the steer, Tom Gill told him that the animal belonged to J. F. Wilkins of Young county. Gill subsequently made a demand upon witness for the steer, as the steer of Wilkins, and witness bought the animal from Gill as the agent of Wilkins. Witness then went to defendant about the matter, and defendant said that he bought and paid for the steer, and had his bill of sale on record, and would fight Wilkins in court for title to the animal. Witness spoke to defendant several times afterwards, on which occasions he promised to pay witness, and fall back on his vendor for reimbursement. Witness was not aware that he had ever done so.

Tom Gill was the next witness for the State. He testified that he knew J. F. Wilkins of Young county, and was familiar with his stock brand. On or about November 1, 1884, the witness saw the steer alleged to have been stolen in Shoemaker's pasture near Decatur. He told Shoemaker that the animal belonged to Wilkins. The witness subsequently saw Wilkins and told him that he had seen the steer in Shoemaker's pasture. Wilkins thereupon authorized witness to recover the animal for him. Witness then called upon Shoemaker and sold him the steer. When Wilkins came to Decatur, a short time afterwards, witness went with him to Shoemaker's pasture, where Wilkins saw and identified the animal, and thence called with him upon Shoemaker, who paid Wilkins for the animal. That animal was in Wilkins's brand. Before this last transaction, and subsequent to the sale of the steer to Shoemaker by the defendant, the witness made it his business to see and talk to defendant several different times about the animal. Defendant at first told the witness that he bought the entire brand in which the animal was branded, paying therefor $100, which money he drew from a Decatur bank. At another time he told the witness that he gave two horses for the brand. Wilkins owned a few scattering cattle in the western part of Wise county in the fall of 1884, branded 82 barred out,— that is, a horizontal bar across the figures 82.

J. F. Wilkins testified, for the State, that his residence was in Young county. He owned the steer mentioned in the indictment, at the time it was placed in Shoemaker's pasture. The witness last saw the animal described in June or July, 1884, in the eastern part of Wise county, where it was dropped from a herd which was then being driven by witness from Young county to Sherman. The brands on the animal which the witness remembered were a circle-Z on the side and a plain Z on the hip. Witness had cattle in such brand, and also cattle branded 14 barred out and 82 barred out. Witness had a few cattle in each brand in the western part of Wise county. Some of them had been dropped from herds *en route* to market, and some had drifted there from Young county.

Ben Heath was the next witness for the State. He testified that he lived in Hunt county. He was attached and brought to court as a witness for the defendant. The witness's mother, some time in the year 1884, received a letter from the defendant stating that he had found some of her cattle in Wise county, and advising her to send witness to said county to see about them. Witness and his mother once owned cattle in Wise county, and left some six or seven head in that county belonging to them, in the circle-Z brand. Witness went to defendant's house in Wise county in response to defendant's letter, and when he arrived the defendant told him of a lot of stray cattle running in Wise county. He asked witness to execute to him a bill of sale to the stray cattle, so that he could gather them. Witness went with the defendant to Denton creek in Wise county, and saw the steer described in the indictment. Witness did not sell or offer to sell that steer to the defendant or anybody else. No one else was with witness and defendant when they saw the steer on Denton creek. Witness did not want to execute a bill of sale to defendant, conveying any cattle, but defendant frightened him into doing so by threatening that, if he did not execute such a bill of sale, one Campbell would prove witness's pony away from him, and leave him, witness, in Wise county, unable to get home. Witness remained in Wise county about six weeks, unable to get away from the defendant. Either the defendant or one of his brothers was with the witness the whole of the time during witness's stay in Wise county. Witness had no recollection of passing a single night during those six weeks at any house other than old man Hornsberger's or Joe Hornsberger's, except when the defendant kept him company. Old man Hornsberger lived near Paradise in Wise county. Witness and his mother lived near that town during the preceding year, and the year previous to that they lived at Bridgeport, some

eight miles from Hornsberger's. Witness had a limited acquaintance in Paradise. He knew Fred Mershon, the county treasurer, Billy Mershon, county commissioner, and with 'Squire Rhodes. Witness saw each of those parties in Wise county often before he executed the bill of sale to defendant, but he never mentioned to them or to any one else that the defendant was trying to make him execute a false bill of sale in order to enable him to steal stray cattle. Witness was afraid to; he was afraid of being robbed (mobbed?). When the witness signed the bill of sale, which he did in an office in the court-house building, he thought he was signing a power of attorney. The witness did not tell the man who wrote the bill of sale that he, witness, was executing the bill of sale because he was afraid not to. The witness never offered to sell the steer described in the indictment to Tom Hunter, Mitch. Hornsberger, Jim Munday, or anybody else. Witness only offered to sell the cattle in the circle-Z brand. He offered to sell other cattle than the circle-Z cattle to Campbell, but was told by defendant to offer Campbell the circle-Z cattle too, so as to secure a witness in the event of trouble. Witness thereupon offered to sell Campbell the cattle mentioned in the bill of sale to the defendant. When witness was brought to Decatur in charge of the officers, he was met at the railroad depot by the defendant, his brothers, and Tom Hunter and Jim Munday. They advised witness to testify so as to acquit defendant, and that then defendant would so testify as to acquit the witness; that defendant would not permit the witness to lie in jail exceeding three weeks. From the depot the witness and the parties named went to the public square, when the officer in charge of witness left them. The Hornsberger brothers, including defendant, and witness and Hunter went then to the law office of Lovejoy & Verne, attorneys for the defendant. There in that office, in the presence of defendant, Mitch. and Drest Hornsberger, Hunter, Munday and Mr. Lovejoy, witness stated to Mr. Verne that the transaction between witness and defendant was all fair and in good faith; that he, witness, and his mother, owned the cattle described in the bill of sale; that he, witness, sold the same to defendant, and that defendant paid him for them. Witness made this statement to Mr. Verne because he was afraid of being mobbed by defendant and his brothers if he did not. On the day following the conversation in the office, witness met Mr. Verne on the street and told him that his statement of the day before was true. Defendant gave witness an old pony and a pair of boots for the bill of sale. Witness became frightened on the day after his arrival in Wise county in answer to defendant's letter, and

was frightened until he got home. After the parties named left Lovejoy & Verne's office, defendant told witness to swear, when on the stand, to the statement he had just made; that it would result in his acquittal, and might result in witness being jailed for a few days; but that he, defendant, would get witness out of the trouble all right. Witness then went to the court-house and was recognized as a witness. The county attorney, in the presence of the sheriff and deputy sheriff Lindsey, then talked to witness about the case, and witness related the history of the whole transaction just as he has related it on this stand. Defendant told witness that some stray cattle in the 82 "barred out" brand were running in the western part of Wise county, on West Fork creek, which could be had. Defendant and witness got one cow in that brand, which defendant took. The State closed.

Defendant introduced in evidence the following bill of sale:

"THE STATE OF TEXAS, }
   *County of Wise.* }

"Know all men by these presents that we, Benjamin Heath and Jane Heath, of Hunt county, Texas, for and in consideration of $100 to us in hand paid by Alexander Hornsberger, of the county of Wise and said State, the receipt of said amount we hereby acknowledge, have sold, bargained and transferred to the said Alexander Hornsberger the following described personal property: The entire stock of cattle now belonging to the said Jane Heath in the following marks and brands, the principal mark being a crop off the left and overslope off the right ear, and also in various other marks, and branded circle-Z on different parts of the animals, and some branded also Z, and the older cattle having 82 (barred out) brand, and known as the Heath stock of cattle. To have and to hold the above described property, unto the said Alexander Hornsberger, his heirs and assigns forever.

"Witness our hands this 8th day of October, A. D. 1884.

His
"JANE HEATH, by BENJAMIN ⋈ HEATH, Agent.
Mark.

                                                 His

"W. P. VANNATTA."                           "BENJAMIN ⋈ HEATH."
                                                   Mark

"THE STATE OF TEXAS, }
   *County of Wise.* }

"Before me, John W. Hogg, clerk of the county court in and for Wise county, Texas, this day personally appeared Benjamin Heath, proven to be the person whose name is subscribed to the foregoing bill of sale, by the oath of W. H. Mershon, and the said Benjamin

Heath acknowledges that he signed said instrument as the agent for Jane Heath, and for himself, for the purposes of and consideration therein expressed.

"In testimony whereof, I have hereto set my seal of office and signature officially, this October 8, A. D. 1884.

[L. S.]          "John W. Hogg, Co. Clk. Wise Co., Texas.

"By T. A. Fuller, Deputy."

The defendant next introduced in evidence, from the record of marks and brands, the following:

| Name of Owner. | Place of Residence. | Kind of Animal. | Marks. | Brands | Location of Brand. | Month. | Day. | Year. |
|---|---|---|---|---|---|---|---|---|
| Alexander Hornsberger. | Paradise. | Cattle. | Crop off left, and over-slope and two under-bits in the right ear. | Z and Circle-Z. | Various localities. | 10. | 8. | 1884. |

Tom Hunter testified, for the defense, that he and the defendant were brothers-in-law. Witness lived in Denton county. He knew Ben Heath, the State's witness, who lived in Hunt county, and saw him in Wise county in October or November, 1884. Witness also knew the steer mentioned in the indictment. Witness and Jim Munday, *en route* from Denton to Wise county, in October or November, 1884, met the defendant and Ben Heath on Denton creek in the east edge of Wise county, and were with them when they, the defendant and Heath, stopped to examine the steer. Heath had tried several times to sell the same cattle to witness which he finally sold to defendant. He offered to sell the witness the cattle in the circle-Z brand, claiming that those cattle belonged to him and his mother, and were left by them when they moved from Wise to Hunt county. The defendant knew where the steer was, and went with Heath to see it, and Heath told defendant that the steer belonged to him. It was admitted by the defense that the witness Hunter was under indictment for the theft of a bale of cotton, and that the defendant was a witness for him.

Jim Munday, another brother-in-law of the defendant, testified to the same facts as those narrated by Hunter, and in substantially the same language. He stated, in addition, that he was with the Hornsberger boys when they met the witness Heath at the depot on his arrival in Decatur. Heath did not appear in the least alarmed. No one of the party who went with Heath to Lovejoy & Verne's office made any threats of violence against him. Witness heard the

conversation at the law office between Mr. Verne and Heath. Heath said that he had authority from his mother to sell, and, for her and himself, had sold the cattle to the defendant, and executed his bill of sale; and that the steer mentioned in the indictment was one of the animals he sold the defendant. Defendant knew that the steer was on Denton creek, and went with Heath to see it.

Mitch. Hornsberger, the defendant's brother, testified for the defense that he remembered Heath's visit to Wise county in 1884, and his sale of cattle to the defendant. Heath tried to sell to the witness the same cattle, which he claimed that he owned. Witness, acting for his brother, the defendant, delivered to Heath, in payment for the cattle, a pony valued at $40, a saddle valued at $15, and a pair of boots valued at $5. Defendant got the witness to negotiate the trade with Heath, because Heath appeared to fear that defendant would cheat him.

M. Campbell testified that Heath had, in defendant's presence, tried to sell him, witness, the same cattle which he afterwards sold the defendant.

Charles Verne was the defendant's next witness. He testified that, on the second day next preceding this trial, the Hornsberger boys, including the defendant, with Hunter and Munday, came into his office with Ben Heath, and introduced him to witness as the witness for the defense who had been brought from Hunt county. Witness asked Heath about the cattle transaction with defendant, and he said that the steer mentioned in the indictment was one of the animals which he sold to the defendant. Heath did not in the least appear frightened, but, on the contrary, very indignant that his good faith in the transaction should be questioned. Witness met Heath on the streets on the morning after the above-mentioned conference, and spoke to him again about the matter, when Heath, who appeared excited and frightened, told witness that he had been advised not to talk about the matter until he was placed on the stand. Witness then asked Heath if he had lied to him the day before. He said that he had not; that he told witness the truth. The defense closed.

Joe Barnes was the first witness introduced by the State in rebuttal. He testified that he knew Mrs. Jane Heath and Ben Heath when they lived in Wise county. Mrs. Heath sold her stock of cattle when she moved from Wise to Hunt county, claiming, however, to have left a few branded circle-Z on the hip. Witness remembered Ben Heath's visit to Wise county in 1884, when he is said to have executed the bill of sale to the defendant. Most of his

time while in Wise county on that visit, Heath stayed with the Hornsbergers. He was offering to sell the circle-Z brand of cattle, but no other brand that witness heard of. Heath was a youth of perhaps seventeen years of age, very weak minded, and easily influenced by others.

Frank Morris and Bud Moore testified, for the State, in rebuttal, that they remembered the occasion of Ben Heath's return to Wise county in 1884. They knew that he then offered for sale the circle-Z brand, in which brand he claimed that he and his mother owned a few head of cattle remaining in Wise county. They never heard of his trying to sell any other brand.

W. H. Mershon testified that he identified Ben Heath to Mr. Fuller, the deputy county clerk, before whom the bill of sale in evidence was acknowledged, as a boy he had known about Paradise a year or two before. He did this at the request of the defendant. M. Campbell's reputation for truth and veracity was so bad that he was not entitled to credit on the witness stand.

The motion for new trial raised the questions discussed in the opinion.

The transcript brings up no briefs for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

HURT, JUDGE. This is a conviction for the theft of a steer, the property of J. A. Wilkins. The record discloses that there were many cogent facts tending to prove that one Ben Heath, upon whose testimony the State mainly relied for a conviction, was an accomplice. Upon the subject of an accomplice the trial judge charged as follows:

"An accomplice is one who is not present at the commission of an offense, but who before the act is done advises, commands or encourages another to commit the offense, or who agrees with the principal offender to aid him in the offense, or who proposes aid prior to the commitment of an offense, for the purpose of assisting in the execution of the offense. In this case, if you find beyond a reasonable doubt that the testimony of the witness Bob Heath is true, then he is an accomplice, and I charge you that a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense." To this charge defendant excepted when given, and reserved his bill.

Whether the testimony of the witness was true or false is never the test as to whether he is an accomplice or not. His testimony may be false in some respects and true in others, and yet he may or may not be an accomplice. If true in regard to some part and false in another, the jury would be placed in an embarrassing situation; hence this charge is calculated to confuse and mislead the jury.

Again, this charge makes Heath an accomplice alone in the event that the jury should believe his testimony to be true; thus excluding the jury from considering the testimony of the other witnesses in determining the question. This is error for which the judgment is reversed.

The learned judge seems to be impressed with the idea that the word *accomplice* as used in article 741, Code Criminal Procedure, and as used in article 219, Penal Code, are to be given the same meaning. In this there is mistake, because this word as used in article 741, Code Criminal Procedure, includes principals and accessories as well as accomplices technically. ( *Williams* v. *The State*, 42 Texas, 392; 1 Texas Ct. App., 301; id., 628; 2 Texas Ct. App., 588; 3 Texas Ct. App., 575.)

As applicable to the facts of this case there may not have been error in the charge in regard to this matter, for the evidence tends to show that Heath was an accomplice technically.

Because of the error in the charge as above noted, the judgment is reversed and the case remanded.

*Reversed and remanded.*

[Opinion delivered November 14, 1885.]